**NOT FOR PUBLICATION**

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL
OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No. AZ-17-1083-KuFS |
| JAMES L. OSBORN, JR.; CENTRAL STATES NATURAL GAS, LLC; CENTRAL STATES ENERGY, LLC, | Bk. Nos. 2:14-bk-03079-BKM 2:14-bk-03080-BKM 2:14-bk-03081-BKM (jointly administered) |
| Debtors. | Adv. No. 2:16-ap-00061-BKM |
| SHERYL OSBORN, | |
| Appellant, | |
| v. | M E M O R A N D U M* |
| DAVID M. REAVES, Chapter 7 Trustee, | |
| Appellee. | |

Argued and Submitted on October 26, 2017
at Phoenix, Arizona

Filed - November 9, 2017

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Brenda K. Martin, Bankruptcy Judge, Presiding.

Appearances:     Chris D. Barski of Barski Law argued for appellant Sheryl Osborn; Alan R. Costello of Costello Law Firm argued for appellee, David M. Reaves, Chapter 7 trustee.

Before:   KURTZ, FARIS, and SPRAKER, Bankruptcy Judges.

---

* This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

-1-

Sheryl (Sheryl) and James L. Osborn, Jr. (James) (collectively, the Osborns) entered into a premarital agreement (PMA) in Kansas whereby the parties agreed to hold their existing and future acquired property as separate property. The Osborns agreed that the PMA would be governed by Kansas law.

The Osborns moved to the community property state of Texas and executed a waiver of community property laws (Waiver), restating their intent to keep their property separate.

The Osborns then moved to the community property state of Arizona where James filed a chapter 11[1] bankruptcy petition which was converted to chapter 7. Sheryl moved for declaratory relief relating to property which she asserted was her sole and separate property and not subject to James' creditors. The chapter 7 trustee, David M. Reaves (Trustee), argued that the PMA and Waiver were not valid as to James' creditors because the Osborns failed to record them as required under Ariz. Rev. Stat. (A.R.S.) § 33-413. The bankruptcy court agreed with Trustee. Sheryl moved for reconsideration, which the bankruptcy court denied. This appeal followed.

We are called upon to interpret A.R.S. § 33-413 which requires the recordation of agreements made in consideration of marriage in order to be valid against creditors without actual notice. No Arizona court has interpreted the statute, much less cited it. As an issue of first impression, we predict that the

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure and "Civil Rule" references are to the Federal Rules of Civil Procedure.

Arizona Supreme Court would interpret A.R.S. § 33-413 as the bankruptcy court did. Accordingly, we AFFIRM.

## I. FACTS

James filed an individual chapter 11 petition on March 9, 2014. Sheryl, allegedly a member of Central States Natural Gas, LLC (CSNG), signed and filed CSNG's chapter 11 petition on the same date. James, as a member of Central States Energy, LLC (CSE), signed and filed CSE's chapter 11 petition at the same time. The bankruptcy court later entered an order authorizing joint administration of the three cases. Still later, the cases were converted to chapter 7, and Mr. Reaves was appointed the chapter 7 trustee for the estates.[2]

## A. Declaratory Relief: Ownership Of CSNG

Sheryl filed a motion to obtain a declaratory ruling that she was the 100% owner of CSNG, and thus her interest was not property of James' bankruptcy estate. Sheryl asserted her ownership based on an operating agreement which showed her as the sole member.

She also relied upon the 1990 PMA whereby the Osborns agreed to keep all property separate. The PMA provided that "separate property" shall include not only all real and personal property owned at the time of their marriage, but also "all other property, assets, or estate which may be purchased, acquired or received in any manner by each of the parties after their marriage, which includes but is not limited to any shares

---

[2] In CSNG's case, Mr. Reaves was disqualified and replaced by trustee Lothar Goernitz. CSNG's administratively insolvent case was closed in August 2017.

-3-

of stock, partnership interest or similar property from any business or company formed by such party or with any other person." The PMA further stated that the parties intended to make their residence after marriage in the state of Kansas, and thus the agreement "shall be governed by the laws of Kansas." The schedule attached to the PMA listed various assets and liabilities of James and showed his net worth as $26 million while Sheryl's was $75,000.

In support of her motion, Sheryl also relied upon the Waiver which was executed by Sheryl and James in 1995 after they moved to Texas. There, the parties agreed that any assets titled in their individual names were to remain the separate property of each of them and that they did "not desire to have any of their assets treated as community property." The Waiver stated that the parties each had formed individual trusts and that the assets titled in the name of each of the trusts as well as any assets that were titled in each of their individual names were to remain the separate property of each them, except as may otherwise be provided under the terms of the PMA.

Based on the operating agreement, PMA, and Waiver, Sheryl sought a declaration that her 100% ownership interest in CSNG was not property of James' bankruptcy estate.

In response, Trustee provided evidence of a different operating agreement which showed James as the sole member of CSNG. Other evidence showing that James was the owner and sole member of CSNG included:

● tax returns showing that James was the proprietor of CSNG in 2008, 2009, 2010, and 2011. It was not until 2013 where the

-4-

tax return showed Sheryl was the proprietor of CSNG.

• CSNG applied to the Kansas Secretary of State to do business in Kansas in March 2008. The application showed James as the manager or member, and James signed the application as manager or member. Copies of the 2008, 2010, and 2011 annual reports filed with the Kansas Secretary of State by CSNG showed that the James L. Osborn, Jr. Revocable Trust was the owner of CSNG. These annual reports were signed by James under penalty of perjury.

Trustee alleged that the operating agreement submitted by Sheryl was a duplicate copy of James' operating agreement with two simple changes: the name of the sole member in paragraph 5 and the signature block. According to Trustee, the preparation and execution of duplicate and essentially identical operating agreements, one for James and one for Sheryl, was "significant and substantial evidence of their fraudulent intent and conspiracy to avoid and defraud creditors." Based on his evidence, Trustee contended that Sheryl's motion should be denied.

The bankruptcy court later deemed the contested matter requesting declaratory relief to be an adversary proceeding.[3] Trustee filed an answer and counterclaim alleging that James' transfer of his ownership interest in CSNG to Sheryl was made with the actual intent to hinder, delay, or defraud creditors.

---

[3] Pacific Western Bank (PWB) filed a motion to intervene in the adversary proceeding which the bankruptcy court granted. James listed PWB as an unsecured creditor holding a civil judgment against him in the amount of $2.5 million.

-5-

Trustee sought avoidance of the transfer under §§ 544 and 548 and recovery of the asset for the benefit of the estate under § 550.

The matter proceeded to trial in August 2016. At a separate hearing, the bankruptcy court ruled that James was the owner of CSNG and not Sheryl. The court next considered allowing the parties an opportunity to brief the issue whether the PMA and Waiver were valid against James' creditors under A.R.S. § 33-413. Sheryl asserted that the issue was irrelevant due to the bankruptcy court's ruling regarding the ownership of CSNG. Trustee argued that the issue was relevant since the Osborns contended that Sheryl owned substantial jewelry, automobiles, and other business entities as her sole and separate property. The bankruptcy court authorized further briefing by the parties.

The court later entered a final judgment denying Sheryl's request for declaratory relief and finding that James was, and always had been, the sole member of CSNG.

**B.     Applicability Of A.R.S. § 33-413 To The PMA And Waiver**

The parties filed simultaneous opening and responsive briefs on the applicability of A.R.S. § 33-413 to the PMA and Waiver. A.R.S. § 33-413 provides:

> No covenant or agreement made in consideration of marriage shall be valid against a purchaser for valuable consideration, or a creditor not having notice thereof, unless the covenant or agreement is duly acknowledged and recorded in the manner and form required for deeds and other conveyances.

Relying on this statute, Trustee asserted that the Osborns' failure to record the PMA and Waiver made them invalid as to

James' creditors. In turn, Sheryl argued that under the plain language of A.R.S. § 33-413: (1) the PMA and Waiver were not "agreements made in consideration of marriage" and (2) the statute applied to secured creditors and real property and not to general unsecured creditors or personal property.

In support of her first contention, Sheryl noted that other Arizona statutes referred to a premarital agreement as a "premarital agreement" or "marital agreement" and not as an "agreement made in consideration of marriage." A.R.S. § 25-201 defines a "premarital agreement" as "an agreement between prospective spouses that is made in contemplation of marriage and that is effective on marriage." A.R.S. § 25-202 provides:

> A marital agreement must be in writing and signed by both parties. The agreement is enforceable without consideration. . . . The agreement becomes effective on marriage of the parties.

Sheryl argued that the "without consideration" language in A.R.S. § 25-202 was important since family practitioners know that marriage is never consideration for a premarital agreement. She further asserted that the Waiver was a postnuptial agreement which could not be "in consideration of marriage" given that it was entered into after the marriage.[4]

---

[4] A.R.S. §§ 25-201 and 25-202 are part of Arizona's Uniform Premarital Agreement Act (PMAA) which became effective September 21, 1991. Prior to the enactment of the PMAA, there was no statute in Arizona that defined a "premarital agreement" or "property" in relation to a premarital agreement. See A.R.S. § 25-201 (definitions). The PMAA was enacted in Kansas at the time the Osborns entered into the PMA. Arizona enacted the PMAA after the Osborns entered into the PMA, but before their execution of the Waiver in Texas.

In support of her second argument, Sheryl maintained that Title 33 of A.R.S. deals with real property rights and interests, including landmarks and surveys, landlord and tenant, conveyances and deeds, mortgages, deeds of trust, liens, homesteads, condominiums, mobile home parks, timeshares, and homeowners associations. Sheryl argued that A.R.S. § 33-413 could not be read in isolation and that overall, the statutory scheme shows that the statute applies to agreements in consideration of marriage that affect real property interests.

Sheryl further maintained that unrecorded premarital agreements are binding on unsecured creditors under Arizona case law, citing Schlaefer v. Financial Management Service, Inc., 996 P.2d 745 (Ariz. Ct. App. 2000), and Elia v. Pifer, 977 P.2d 796 (Ariz. Ct. App. 1998).[5]

In addition, Sheryl pointed to statutes from Texas and California to support her position that A.R.S. § 33-413 applied only to agreements affecting real property. The Texas Uniform Premarital Agreement Act provides:

> An agreement made under this subchapter is constructive notice to a good faith purchaser for value or a creditor without actual notice only if the instrument is acknowledged and recorded in the county **in which the real property is located.**

Tex. Family Code § 4.106(b) (emphasis added).

California Family Code § 1502, entitled "Recording of

---

[5] These cases cannot be binding precedent on a point of law, i.e., that A.R.S. § 33-413 does not apply to unsecured creditors, when the statute is neither mentioned nor discussed. See Sakamoto v. Duty Free Shoppers, Ltd., 764 F.2d 1285, 1288 (9th Cir. 1985) ("[U]nstated assumptions on non-litigated issues are not precedential holdings binding future decisions.").

-8-

Agreements," provides:

> (a) A premarital agreement or other marital property agreement that is executed and acknowledged or proven in the manner that a grant of real property is required to be executed and acknowledged or proved may be recorded in the office of the recorder of each county **in which real property affected by this agreement is situated**.

Emphasis added.

According to Sheryl, A.R.S. § 33-413, unlike Texas or California, does not specify in which county the "agreement in consideration of marriage" must be recorded. Sheryl maintains that if A.R.S. § 33-413 is read literally, without statutory context or common sense, you could seemingly have your pick of which of Arizona's fifteen counties to record in, especially as it pertains to personal property.

In sum, Sheryl asserted that all property acquired during her marriage to James was the sole and separate property of each spouse. Therefore, James' creditors had only a claim to his sole and separate assets.

Finally, Sheryl asserted that factual and legal issues remained. She contended that she was not permitted to conduct any discovery on whether creditors had actual notice of the PMA and Waiver. She further argued that she did not brief choice of law issues and contended that both the PMA and Waiver were governed by Kansas law, not Arizona law. Without elaborating, Sheryl maintained that the location of the personal property may also be relevant to determining the choice of law or whether community property laws even apply.

Trustee responded that A.R.S. § 33-413 clearly requires marital agreements to be recorded, and the plain language of the

-9-

statute shows that the recording is not limited to agreements in consideration of marriage that transfer real property. Trustee also cited the Arizona Legal Forms, Domestic Relations § 13:17, which addresses A.R.S. § 33-413:

> One area that is often overlooked is having the agreement, or a summary thereof, recorded. As many individuals are reluctant to record their entire agreement, a notice can be recorded. In situations where the parties are not responsible for the other's debts, it is imperative that such matter be recorded in order to place creditors and other third parties on notice.

Catherine A. Creighton and Therese R. McElwee, 4A Ariz. Legal Forms, Domestic Rel. § 13:17 (3d ed. 2016).

Trustee further argued that the Texas and California statutes cited by Sheryl expressly refer to real property while the plain and unambiguous language of A.R.S. § 33-413 makes no reference to real property or in any way limits its applicability to real property. According to Trustee, the language in A.R.S. § 33-413 does not place any limitation on who can be a "creditor," secured or otherwise.

Finally, Trustee maintained that the statute is not limited to real property by virtue of being included in Title 33, because other statutes within Title 33 apply to more than real property. See A.R.S. § 33-412(A) (requiring the recording of deeds of settlement upon marriage, whether of land, money or other personal property, which must be recorded or are otherwise void as to creditors and subsequent purchasers for valuable consideration without notice). Moreover, Title 33 addresses both real and personal property, including personal property exemptions (A.R.S. § 33-1121 et seq.), and personal property

-10-

liens (A.R.S. § 33-1021 et seq.) among others. In light of the overall statutory scheme, Trustee argued there was no reason for the bankruptcy court to read an unstated limitation into A.R.S. § 33-413.

In her responsive brief, Sheryl argued that the resolution of the enforceability of the PMA and Waiver would not resolve all issues relating to her property. Sheryl asserted that the bankruptcy court should import no binding effect to any ruling on the PMA and Waiver on other property as those consequences were not before the court factually. Sheryl pointed out that there were no factual findings whether any creditor of the estate had, or did not have, actual notice of the PMA and Waiver.

On January 25, 2017, the bankruptcy court issued its ruling in favor of Trustee. The court found A.R.S. § 33-413 unambiguous, noting that its plain language did not limit its application to a lien creditor, and therefore it applied to all creditors. The court further found that the PMA and Waiver were agreements made in consideration of marriage and thus within the scope of the statute. Although Trustee was instructed to prepare and upload an order reflecting this ruling, he did not do so until May 22, 2017.

**C.    The Motion For Reconsideration**

On February 22, 2017, Sheryl filed a motion for reconsideration under Civil Rule 59(e). The basis for the motion was that "further research" showed that the terms

-11-

"marriage settlements" and "marriage contracts"[6] emanated from common law England whereby an unmarried woman essentially forfeited all of her property to her husband upon marriage. These marriage settlements or marriage contracts were creations of the common law that were almost universally upheld by the Courts of Chancery in England to preserve a woman's property for her own benefit. Sheryl maintained that these antiquated "marriage settlements" were in no way comparable or analogous to a modern-day divorce decree. Likewise, these dated "marriage contracts" were not analogous to a premarital agreement or postnuptial agreement as the court so ruled.

Trustee responded that the motion was untimely because under Rule 9023, a Civil Rule 59(e) motion must be filed no later than fourteen days after entry of judgment. Since Sheryl filed the motion for reconsideration twenty-eight days after the court's ruling, it must be denied. Trustee maintained that Civil Rule 59(e) could not be used by a losing party who failed to raise available arguments in the first place.

On March 2, 2017, the bankruptcy court denied the motion as untimely. Sheryl filed a timely appeal from this ruling.

Subsequently, the Panel ordered Sheryl to show that a separate order had been entered or file a response as to why the January 25, 2017 ruling was sufficiently final to support the Panel's jurisdiction. On May 22, 2017, the bankruptcy court

---

[6] The term "deeds of settlement upon marriage" is contained in A.R.S. § 33-412, entitled "Invalidity of unrecorded instruments as to bona fide purchaser or creditor." The term "marriage contract" is found in the title of A.R.S. § 33-413.

-12-

entered an order regarding its ruling on the PMA and Waiver. Accordingly, the Panel found that all issues in the adversary proceeding were finally resolved.

## II. JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

Did the bankruptcy court err in finding that the PMA and Waiver were "agreements made in consideration of marriage" and thus within the scope of A.R.S. § 33-413?

Did the bankruptcy court err in finding that A.R.S. § 33-413 was not limited to marital agreements affecting real property?

Did the bankruptcy court err in denying the motion for reconsideration?

## IV. STANDARDS OF REVIEW

We review a bankruptcy court's legal conclusions, including its interpretation of state law, de novo. Roberts v. Erhard (In re Roberts), 331 B.R. 876, 880 (9th Cir. BAP 2005), aff'd, 241 F. App'x. 420 (9th Cir. 2007).

Denial of a motion to amend or alter judgment under Civil Rule 59(e) is reviewed for an abuse of discretion. Dixon v. Wallowa Cty., 336 F.3d 1013, 1022 (9th Cir. 2003). To determine whether the bankruptcy court abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, whether the bankruptcy court's

-13-

application of the legal standard was illogical, implausible or "without support in inferences that may be drawn from the facts in the record." United States v. Hinkson, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc).

# V. DISCUSSION

Under § 541(a)(2), the debtor's estate includes all of the debtor's and the non-filing spouse's interests in community property. Given this interest, creditors are entitled to a full accounting of a debtor's assets, which may be affected by the presence or absence of valid agreements that purport to determine whether property is community or separate property. If the PMA and Waiver are not valid as to James' creditors who have neither actual nor constructive notice of the agreements, Sheryl's separate property may[7] be deemed community property, and it would become part of James' bankruptcy estate under § 541(a)(2).

## A. Interpretation Of A.R.S. § 33-413

Whether the PMA and Waiver are valid against James' creditors depends upon whether those agreements fall within the ambit of A.R.S. § 33-413. The statute, entitled "Invalidity of unrecorded marriage contract as to bona fide purchaser or creditor," provides:

> No covenant or agreement made in consideration of marriage shall be valid against a purchaser for valuable consideration, or a creditor not having notice thereof, unless the covenant or agreement is

---

[7] Although the PMA and Waiver are void as to James' creditors, we do not decide in this appeal whether other law or rules are relevant to the separate/community property determination.

-14-

duly acknowledged and recorded in the manner and form required for deeds and other conveyances.

When we interpret state law, we are bound by the decisions of the applicable state's highest court. Kekauoha-Alisa v. Ameriquest Mortg. Co. (In re Kekauoha-Alisa), 674 F.3d 1083, 1087 (9th Cir. 2012). And when, as here, the state's highest court has not interpreted the dispositive state law, we do our best to predict how that state's highest court would decide the issue. Id. at 1087-88. The court may use "decisions from other jurisdictions, statutes, treatises, and restatements as guidance." Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia, 379 F.3d 557, 560 (9th Cir. 2004).

In interpreting Arizona statutes, the Arizona Supreme Court has stated that its duty is to determine the intent of the legislature at the time of enactment. Jackson v. Phoenixflight Prods., Inc., 700 P.2d 1342, 1345 (Ariz. 1985). "Where the language of the Legislature is clear and leaves no opportunity for interpretation, the language must be followed." Id. And "clear language in a statute is given its usual meaning unless impossible or absurd consequences would result." Ruben M. v. Ariz. Dep't of Econ. Sec., 282 P.3d 437, 441 (Ariz Ct. App. 2012); Marriage of Gray, 695 P.2d 1127, 1129 (Ariz. 1985).

### 1. Common Law "Marriage Contracts"

Sheryl asserts that the term "marriage contract" as used in the title of A.R.S. § 33-413 is an "antiquated legal arrangement" to avoid outdated concepts preventing married women from owning property and thus has no applicability to modern premarital and postnuptial agreements.

-15-

> By the rules of the common law the husband, upon the marriage, becomes the absolute owner of the wife's personal property in possession. This transfer of her property by the marriage may be provided against by contract. The Virginia act, and all similar acts, are passed to notify all persons that the property did not vest in the husband by the marriage, but was reserved to the separate use of the wife.

Morgan v. Elam, 12 Tenn. 375, 379 (Tenn. 1833). The "marriage contract" had the effect and intent of preventing the wife's property from vesting in the husband by virtue of the marriage. Id. at 383-84.

Using a trust, a woman was able to stay in possession and control of her property during marriage in contravention of the common law's rules regarding a married woman's property. "A marriage settlement, then, is a conveyance of property upon defined trusts, as a marriage contract is an agreement that it shall be made, enforceable in a court of equity, and its effect to give a different direction to property from that which would result from a marriage without any settlement, or contract for settlement, and looks most usually to the interest of the wife and the issue of the marriage union." Sullivan v. Powers, 6 S.E. 395, 396 (N.C. 1888).

Statutes were enacted to require the registration of marriage contracts and settlements to prevent fraud on the husband's creditors. See Saunders v. Gerrill, 23 N.C. 97 (N.C. 1840) (registered and written marriage settlements and marriage contracts were the only evidence against husband's creditors that "'any estate has been secured to the wife.'").

Although this history is interesting, it is of little assistance in our statutory interpretation when the Arizona

-16-

Supreme Court instructs us to follow the plain language of the statute. Sheryl also places too much emphasis on the words "marriage contract," which is in the title of A.R.S. § 33-413. "While words in the title of a statute or the heading of a section can shed light on the meaning of an ambiguous word or phrase in the text of a statute, they cannot create an ambiguity where none otherwise would exist." Nat. Res. Def. Council v. U.S.E.P.A., 915 F.2d 1314, 1321 (9th Cir. 1990). "Since the text is not ambiguous, the caption does not aid our interpretation." Id.

Finally, if A.R.S. § 33-413 has no applicability to modern marriage contracts (i.e., pre and postnuptial agreements), it is up to the Arizona legislature, not this court, to repeal the statute.

**2.    Agreements Made In Consideration Of Marriage**

The PMA and Waiver both constitute "agreements made in consideration of marriage." As the bankruptcy court noted, one definition of "in consideration" is "a taking into account." Consideration, Merriam-Webster, Https://wwww.merriam-webster.com/dictionary/consideration (last visited October 30, 2017). Both the PMA and Waiver were agreements made taking into account the parties' marriage. But for their pending marriage, there would have been no reason for them to have executed the PMA. And, but for their marriage and move to Texas, a community property state, there would have been no need for them to amend or restate their intentions to keep their existing and future property separate through execution of the Waiver. In short, although the PMA and Waiver may not be "marriage contracts" in

-17-

their historical sense, they are "agreements made in consideration of marriage" on their face.[8]  Cf. Sullivan, 6 S.E. at 396 (a marriage contract is an agreement and its effect to give a different direction to property from that which would result from a marriage).

### 3.    Real And Personal Property

We are also not convinced by Sheryl's argument that A.R.S. § 33-413 applies solely to marriage contracts affecting real property.  The plain language of the statute states that it applies to "creditors" without actual notice of the marital agreement and without distinction.  It also does not state that recordation is required only for those agreements that affect real estate.  If the Arizona legislature meant to protect only secured creditors, it could have done so in plain language and directed the agreement to be recorded in the office of the county recorder of the county in which the real property was located.  Cf. A.R.S. § 33-411 (providing that no instrument affecting real property gives notice of its contents to subsequent purchasers unless recorded in the office of the county recorder of the county in which the property is located).

Furthermore, recording statutes are generally for the purpose of providing constructive notice to third parties.  The placement of A.R.S. § 33-413 in Title 33, Article 2 (which addresses the recording of documents in general) evidences the

---

[8] Indeed, construing "in consideration of marriage" as not including premarital agreements would lead to the absurd result of making the statute inconsistent with Arizona's Official Form, entitled "Notice of Premarital Agreements."  See Creighton and McElwee, 4A Ariz. Legal Forms, Domestic Rel. § 13:17.

-18-

Arizona legislature's intent to protect creditors who transact with spouses that have entered into what would otherwise be secret agreements which alter the character of the spouses' marital property from community to separate. In short, without any language showing that the Arizona legislature intended to leave unsecured creditors unprotected under the statute, we cannot import such a limitation.

**B.    Conflict Of Laws**

Sheryl also complains that the bankruptcy court ignored the choice of law clause in the PMA, which refers to Kansas law. In her opening brief, Sheryl contends that CSNG is a foreign corporation with all of its principal assets formerly located in Kansas. Sheryl thus asserts there is no legitimate basis to apply Arizona law as there is in an enforceable choice of law provision in the PMA and all the assets of the entity were located in Kansas. This argument has no merit. The bankruptcy court decided that James was the sole member and owner of CSNG, and that finding is not on appeal.

Furthermore, although the bankruptcy court did not expressly decide the choice of law issue, Arizona courts review choice of law determinations de novo. See Garcia v. Gen. Motors Corp., 990 P.2d 1069, 1075 (Ariz. Ct. App. 1999). The choice of law clause in the PMA provides:

> The parties intend to make their residence after marriage in the State of Kansas, and accordingly this Agreement shall be governed by the laws of Kansas.

This provision shows that the parties intended Kansas law to govern their contractual rights and obligations under the agreement as between themselves because they intended to reside

-19-

in Kansas. It does not overtly state that the clause covers a wide range of claims, disputes, or controversies, including disputes about the validity of the agreement as to third party creditors. The narrow scope of the choice of law clause indicates that it has no application to the present dispute.

In addition, the plain language of A.R.S. § 33-413 expressly requires agreements made in consideration of marriage to be recorded in order to be valid against creditors without actual notice of those agreements. The statute does not give a court discretion to ignore the recording laws based on choice of law provisions in marital contracts to the detriment of third parties which the statute intends to protect. It would be anomalous to allow parties to avoid Arizona's recording statutes by choice of law clauses in private contracts. In sum, A.R.S. § 33-413 applies to the PMA and Waiver notwithstanding the choice of law provision in the PMA.

**C.    The Motion For Reconsideration**

Even if there were error in the bankruptcy court's decision to deny Sheryl's motion for reconsideration based on timeliness, we can affirm on any basis supported by the record. See Brown v. State Bar of Ariz. (In re Bankr. Petition Preparers), 307 B.R. 134, 140 (9th Cir. BAP 2004) (a reviewing court may affirm on any basis supported by the record). The bankruptcy court did not abuse its discretion by denying Sheryl's motion for reconsideration. She did not present newly discovered evidence, demonstrate clear error, or show an intervening change in controlling law. See 389 Orange St. Partners v. Arnold, 179 F.3d 656, 665 (9th Cir. 1999) (setting forth grounds for

-20-

reconsideration under Civil Rule 59(e)); see also Rule 9023 (incorporating Civil Rule 59(e) in bankruptcy proceedings).

## VI.   CONCLUSION

For the reasons stated, we AFFIRM.